**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: THE MATTER OF WEEKS MARINE, INC., AS OWNER AND OPERATOR OF THE M/V NOEL R, PETITIONING FOR EXONERATION FROM OR LIMITATION OF LIABILITY | CIVIL ACTION NO.: 2:23-cv-1045 c/w: 2:23-cv-5285 SECTION "O" DISTRICT JUDGE LONG MAGISTRATE JUDGE NORTH |

**MEMORANDUM IN OPPOSITION TO WEEKS MARINE, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON CERTAIN CLAIMS FOR NON-PECUNIARY DAMAGES AND PUNITIVE DAMAGES**

**NOW INTO COURT** come Claimants, Jonathan Dardar and Brandy Mareno, individually and on behalf of their deceased father, Mike Dardar (collectively, "Claimants"), by and through undersigned counsel, who provide the following Opposition to Weeks Marine, Inc.'s ("Weeks Marine") Motion for Partial Summary Judgment and respectfully submits as follows:[1] Weeks Marine erroneously contends that the undisputed facts of the case support a finding that as a matter of law, Claimants are precluded from recovering certain non-pecuniary damages. In doing so, Weeks Marine asks the Court to ignore genuine disputed facts and withhold a complex question of law and fact to be decided at the trial of this matter. While the Jones Act and general maritime law prescribe the permitted recovery for claimants who fall within their umbrella of protections, neither forbids the current Claimants from seeking relief they request under state law. Here, the decedent, Mike Dardar, did not have an employment-relationship with the M/V MAW MAW EU that was so substantial in both duration and nature as to qualify him as a Jones Act seaman. Additionally, because neither the Jones Act nor the Longshore and Harbor Workers'

---

[1] This Opposition is supported by *Claimants' Response to Petitioners' Statement of Uncontested Material Facts and Statement of Additional Facts That Are Genuinely Disputed,* the *Declaration of Jonathan Dardar* attached as Exhibit 2, and additional exhibits filed contemporaneously herewith.

Compensation Act (LHWCA) specifies the appropriate relief for Dardar, he is properly classified as a "nonseafarer" under general maritime law. Therefore, under general maritime and Louisiana law, Claimants are permitted to submit at the trial of this matter non-pecuniary and punitive damages. Accordingly, for these reasons and those more fully described below, Claimants ask that the Court deny Weeks Marine's Motion for Partial Summary Judgment.

## **BACKGROUND**

This matter arises from a March 23, 2023 collision between the M/V NOEL R (the "NOEL R") with a small, private fishing vessel, the M/V MAW MAW EU (the "MAW MAW EU"), in Pass Tante Phine near Venice, Louisiana (hereinafter, the "Incident"). The MAW MAW EU was owned and operated by Michael Scarabin as a self-employed fisherman.[2] Scarabin would frequently have family members, friends, and other acquaintances join him to assist with deckhand duties, including his close friend, Mike Dardar.[3] Dardar was retired and sometimes enjoyed accompanying his friend on fishing outings. It is uncontested that Dardar was never an employee of Scarabin's and that there was no formal employment agreement between them.[4] However, from time to time and on certain outings, Scarabin would share a small cut of the proceeds from the day's catch with Dardar if Scarabin was able to sell the catch.[5] This cash served as nothing more than gratitude for his friend and Mike Dardar's assistance was merely pocket money for Dardar who was living off of Social Security benefits.[6]

On the day of the incident, Dardar agreed to accompany Scarabin to fish for sheepshead in the Gulf of Mexico after another person Scarabin had initially invited declined.[7] At some time

---

[2] *See* Exhibit 1, Deposition of Michael Scarabin, at pp. 19:1-20:20.
[3] *See* Exhibit 1, Deposition of Michael Scarabin, at pp. 24:8-15, 27:8-17; Exhibit 2, Declaration of Jonathan Dardar.
[4] *See* Exhibit 2, Declaration of Jonathan Dardar.
[5] *See* Exhibit 1, Deposition of Michael Scarabin, at pp. 24:20-25:17; Exhibit 2, Declaration of Jonathan Dardar.
[6] *See* Exhibit 2, Declaration of Jonathan Dardar.
[7] *See* Exhibit 2, Declaration of Jonathan Dardar.

around 5:30 a.m., the NOEL R, owned and operated by Weeks Marine, collided with the MAW MAW EU resulting in Dardar's death. According to Scarabin, George Reno, and Robert Buras, just prior to the Incident, the NOEL R was traveling at a high rate of speed down the wrong side of the channel, and struck the MAW MAW EU, despite efforts by the MAW MAW EU to avoid the collision. In their depositions, all three witnesses testified that it appeared that the NOEL R never saw the MAW MAW EU. The day after Mike Dardar's death, Limitation Petitioner, Weeks Marine, filed the present limitation action.  Weeks Marine now seeks partial summary judgment on the issue of Claimants availability to seek non-pecuniary and punitive damages.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be rendered only if there is no genuine dispute as to any material fact and the movant is clearly entitled to judgment as a matter of law. FED. R. CIV. PROC. 56(a); *see also Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).  When assessing whether a dispute to any material fact exists, courts consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence.  *Id.* at 399-400 (*citing Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The court must "draw all reasonable inferences in favor of the nonmoving party." *Id.* at 400; *see also Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 408 (5th Cir. 2002).  "Although summary judgment is a useful device, it must be used cautiously or it may lead to drastic and lethal results."  *Murrell v. Bennett*, 615 F.2d 306, 309 (5th Cir. 1980).

## LAW AND ARGUMENT

I.    **Dardar does not qualify as a "seaman" under the Jones Act and, therefore, may recover non-pecuniary damages.**

In its Motion, Weeks Marine asks the court to grant partial summary judgment in its favor, finding Dardar qualifies as a Jones Act seaman, thus precluding him and his survivors from recovering certain non-pecuniary damages. Courts have repeatedly emphasized that "[t]he determination of seaman status under the Jones Act is a mixed question of fact and law. It is usually inappropriate to take this question from the jury." *Naquin v. Elevating Boats*, *LLC*, 842 F. Supp. 2d 1008, 1014 (E.D. La. 2012); *Harbor Tug and Barge Co. v. Papai*, 520 U.S. 548 (1997) ("The seaman inquiry is a mixed question of law and fact, and it often will be inappropriate to take the question from the jury."); *Ardoin v. J. Ray McDermott & Co.*, 641 F.2d 277, 280 (5th Cir. 1981) ("[I]t is clear that except in cases where the underlying facts are undisputed, and the record reveals no evidence from which reasonable persons might draw conflicting inferences about these facts, the riddle of seaman's status is one for the jury."); *Barrios v. La. Const. Materials Co.*, 465 F.2d 1157, 1162 (5th Cir. 1972) ("[T]he issue is to be left to the jury even when the claim to seaman status appears to be a relatively marginal one."); *Bodden v. Osgood*, No. 85-4775, 1988 WL 137473, at *4 (E.D. La. Dec. 19, 1988) ("Because seaman status ordinarily is a jury question, a court may rarely conclude as a matter of law that an individual is or is not a seaman within the meaning of the Jones Act.").

Further, the United States Fifth Circuit Court of Appeals has explained that summary judgment may be proper "[w]here the only rational inference to be drawn from the evidence is that *the worker is not a seaman*." *Beard v. Shell Oil Co.*, 606 F.2d 515, 517 (5th Cir. 1979) (emphasis added). Weeks Marine requests that this Court make precisely the opposite determination. But this

is not one of the exceedingly rare cases justifying a determination of seaman status on summary judgment.

The Jones Act provides a cause of action to injured seamen against employers. However, Congress did not define the term "seaman." Thus, the United States Supreme Court undertook the task of defining "seaman" in a trilogy of cases culminating in a two-part inquiry. First, in *McDermott International, Inc. v. Wilander*, the Supreme Court held that the "key to seaman status is employment-related connection to a vessel in navigation." *Wilander*, 498 U.S. 337, 355 (1991). Next, in *Chandris, Inc. v. Latsis*, the Supreme Court clarified that to qualify as a seaman, (1) "an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission," and (2) "a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of ***both its duration and its nature***." *Chandris*, 515 U.S. 347, 368 (emphasis added). Regarding the second prong, the Supreme Court further emphasized that "it is important that a seaman's connection to a vessel in fact be substantial in both respects." *Id.* at 371. Finally, in *Harbor Tug and Barge Co. v. Papai*, the Supreme Court held that a qualified deckhand was not a Jones Act seaman because he could not establish a substantial connection to and identifiable group of vessels under common ownership or control. *Harbor Tug and Barge Co.*, 520 U.S. 548, 560.

While courts are most commonly tasked with determining whether an employment-related connection is adequately substantial, it is occasionally necessary to establish that, as a threshold matter, an employment-related connection to a vessel in navigation exists at all. *See, e.g.*, *Boy Scouts of America v. Graham*, 86 F.3d 861, 866 (9th Cir. 1996) (holding that a genuine issue of material fact existed as to whether a volunteer who served as mate aboard a training vessel qualified for seaman status). To determine whether there exists a master-servant relationship,

courts must consider: "(i) the selection and engagement of the putative employee, (ii) the situation vis-à-vis payment of wages, (iii) the situs of the power of dismissal, and (iv) the situs of control over on-the-job conduct." *Heath v. Am. Sail Training Ass'n*, 644 F. Supp 1459, 1468 (D. R.I. 1986); *see also Graham*, 86 F.3d at 865; *Petition of Read*, 224 F. Supp. 241, 246 (S.D. Fla. 1963). Notably, the "[p]ayment of wages is the least important of these factors, and control is the most important." *Dunham v. Hotelera Canco S.A. de C.V.*, 933 F. Supp. 543, 547 (E.D. Va. 1996); *see also Graham*, 86 F.3d at 865; *Complaint of Falkiner*, 716 F. Supp. 895, 902 (E.D. Va. 1988).

In the present case, Dardar was never an employee of Scarabin and never had an employment-related connection to the MAW MAW EU.[8] Weeks Marine contends that an employment relationship exists solely based upon the fact that Scarabin would share with Dardar a certain percentage of proceeds from the catch for a day, which amounted to nothing more than pocket money for Dardar.[9] While Scarabin maintained control over the vessel, he did not control Dardar's participation, did not control Dardar's job conduct, and did not control Dardar's ongoing engagement. Instead, Dardar was retired and joined when he wanted to, did not join every trip or assist daily, and only joined to assist and spend time with his friends.[10] Dardar was not employed by Scarabin and his involvement was merely something to pass the time.[11] Thus, an evaluation of the totality of the relationship between Dardar and Scarabin would suggest one of friendship and cooperation, not employment.

However, if any employment-related connection did exist, which is vehemently denied, it was certainly not of the substantial nature contemplated by the Supreme Court in *Chandris*. To be sure, "[a] worker who spends less than about 30 percent of his time in the service of a vessel in

---

[8] *See* Exhibit 2, Declaration of Jonathan Dardar.
[9] *See* Exhibit 2, Declaration of Jonathan Dardar; Exhibit 1, Deposition of Michael Scarabin, at p. 24:20-25:17.
[10] *See* Exhibit 2, Declaration of Jonathan Dardar; Exhibit 1, Deposition of Michael Scarabin, at pp. 49:14-62:19.
[11] *See* Exhibit 2, Declaration of Jonathan Dardar.

navigation should not qualify as a seaman under the Jones Act." *Chandris*, 515 U.S. at 349. This is because protections under the Jones Act are reserved for those who have more than "a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea." *Chandris*, 515 U.S. at 369; *see also Davis v. Hill Engineering, Inc.*, 549 F.2d 314, 326 (5th Cir. 1977) ("At the very core of the term 'seaman' is the requirement that a claimant have more than a transitory connection with a vessel in order to recover under the Jones Act."). Indeed, the Fifth Circuit has denied seaman status to wireline operators or similar itinerant maritime workers because, "[a]lthough such workers may spend a significant amount of time on seagoing vessels, they usually have no permanent relationship with a particular vessel or fleet of vessels." *Arleigh v. Schlumberger Ltd.*, 832 F.2d 933, 934 (5th Cir. 1987).

By any standard, Dardar's connection with the MAW MAW EU was not substantial in duration. Dardar was a retiree who went fishing with his close friend, only when invited and when he was so inclined, which was not every time or every day.[12] When Dardar did not feel like accompanying him, Scarabin would get another friend or family member to join.[13] There was no formal employment agreement between Scarabin and Dardar, and Dardar did not receive a salary for his services, but merely from time-to-time and when appropriate given his own sale of the catch, Scarabin would provide Dardar with a small cash payment as a "thank you" for his friend's assistance.[14] Dardar's infrequent and casual outings on the MAW MAW EU do not constitute the type of permanent relationship with a particular vessel or fleet of vessels necessary to qualify for seaman status under the Jones Act.

---

[12] *See* Exhibit 2, Declaration of Jonathan Dardar; Exhibit 1, Deposition of Michael Scarabin, at p. 27:8-17.
[13] *See* Exhibit 1, Deposition of Michael Scarabin, at p. 27:8-17.
[14] *See* Exhibit 2, Declaration of Jonathan Dardar; Exhibit 1, Deposition of Michael Scarabin, at pp. 24:20-25:17.

Furthermore, the Fifth Circuit in *Sanchez v. Smart Fabricators of Texas, L.L.C.* recently established three additional inquiries to consider whether a worker satisfies the nature element of the substantiality test:

1. Does the worker owe his allegiance to the vessel, rather than simply to a shoreside employer?

2. Is the work sea-based or involve seagoing activity?

3. (a) Is the worker's assignment to a vessel limited to performance of a discrete task after which the worker's connection to the vessel ends, or (b) Does the worker's assignment include sailing with the vessel from port to port or location to location?

*Sanchez*, 997 F.3d 564, 573-74 (5th Cir. 2021). The Fifth Circuit reasoned that the "perils of the sea" inquiry is insufficient on its own to determine the nature of a relationship one has with a vessel because, as previously acknowledged by the Supreme Court, "Seaman status is not coextensive with seamen's risk" as "some workers who unmistakably confront the perils of the sea, often in extreme form, are . . . left out of the seamen's protections." *Id.* at 571, 574 (quoting *Chandris*, 515 U.S. at 361-62). Moreover, courts have applied these inquiries in a balancing test and found that a worker does not qualify for seaman status even where one of the factors is satisfied. *See, e.g., Sanchez*, 997 F.3d at 575-76 (welder was not a seaman because two factors weighed against status); *Santee v. Oceaneering Int'l, Inc.*, 95 F.4th 917, 927-28 (5th Cir. 2024) (offshore drilling technician was not a seaman because two factors weighed against status); *Meaux v. Cooper Consolidated, LLC*, 601 F. Supp. 3d 38, 54 (E.D. La. 2022) (barge crane worker was not a seaman where one and a half factors weighed against status).

In the present case, Dardar's connection with the MAW MAW EU was ***not*** substantial in nature. First, Dardar did not owe his allegiance even to Scarabin as a shoreside "employer," let alone to the MAW MAW EU. Dardar had been retired for approximately two years and was living

on his Social Security at the time of his death.[15] If Scarabin asked Dardar to accompany him on an outing and Dardar was not in the mood, he would simply refuse.[16] Dardar was not assigned in any way to the MAW MAW EU nor did he exclusively go fishing on vessels owned and operated by Scarabin.[17] No reasonable person could interpret this dynamic as indicative of allegiance. The lack of such allegiance strongly weighs against defining Dardar as a seaman.

Additionally, Dardar's involvement with the MAW MAW EU was limited and did not include sailing with the vessel from port to port. Similarly, in *Sanchez*, a welder whose duties were specific, discrete, and short-term did not have a substantial connection to a vessel or group of vessels. *Sanchez*, 997 F.3d at 576. Furthermore, the fact that a crewmember does not sail from location to location with a vessel, but "at the end of the day . . . [goes] home like any other longshoreman" weighs against seaman status. *See Meaux v. Cooper Consol., LLC*, 601 F. Supp. 3d 38 (E.D. La. 2022) (finding that a crewmember who did not sail with the vessel, but disembarked daily was not a seaman).

Based on this, Dardar is clearly not a seaman. Dardar did not perform a variety of tasks for the MAW MAW EU; instead, his primary job was to catch fish, and most of the time he did not spend fishing, he spent sleeping.[18] Furthermore, as in *Meaux*, on the occasions Dardar joined

---

[15] *See* Exhibit 2, Declaration of Jonathan Dardar. In its Motion, Weeks Marine relies on Claimants' answer to an interrogatory stating that "Dardar was a self-employed fisherman" in support of its claim that "Dardar [was a] commercial fisherman who made [his] living engaged in the maritime trade of fishing." *See* Memorandum in Support of Motion for Partial Summary Judgment, R. Doc. 53-1, at 3. This answer emphasizes that Dardar was not an employee of Scarabin or any other person or entity at the time of his death. This answer is added to—not contradicted by—the Declaration of Jonathan Dardar that his father was retired at the time of his death and obtained Social Security benefits prior to his death. Furthermore, regardless of whether Dardar is classified as retired or a self-employed fisherman, he did not have an employment-related connection with Scarabin, he did not have a substantial connection to the MAW MAW EU in terms of duration or nature, he did not make his livelihood as a commercial fisherman, and he was not covered by any federal statutory scheme providing causes of action to maritime workers against their employers. Thus, he is not a Jones Act seaman or seafarer under general maritime law.

[16] *See* Exhibit 2, Declaration of Jonathan Dardar; Exhibit 1, Deposition of Michael Scarabin, at p. 27:8-17.

[17] *See* Exhibit 2, Declaration of Jonathan Dardar.

[18] *See* Exhibit 1, Deposition of Michael Scarabin, at pp. 49:14-62:19.

Scarabin, he would board the MAW MAW EU at night and return home in the morning without having accompanied the vessel from port-to-port. Therefore, Dardar does not qualify as a Jones Act seaman.

Weeks Marine attempts to dilute the question of seaman status for purposes of protections under the Jones Act into simple catchphrases such as "Fisherman are seamen." However, as the Court well knows, this is not the whole story. *See In re Matter of Marquette Transportation Co. Gulf-Inland, LLC*, 182 F. Supp. 3d 607, 608 (E.D. La. 2016) (noting that a self-employed commercial fisherman was not a Jones Act seaman); *see also Trinh ex rel. Tran v. Dufrene Boats, Inc.*, 6 So. 3d 830 (2009) (noting that a commercial crab fisherman was not a Jones Act seaman). The issue of seaman status is a complex issue of law and fact which ought only to be decided on summary judgment on the rarest and clearest of occasions. In the present case, there are disputed material facts which create genuine issues for the determination of seaman status including Dardar's employment-related connection with Scarabin, the amount of time Dardar spent aboard the MAW MAW EU and his allegiance thereto, and what constituted Dardar's livelihood at the time of his death. Thus, this issue cannot be appropriately decided on summary judgment. In support of its Motion, Weeks Marine repeatedly cites authority from many decades before the relevant legal tests were established when the maritime industry looked very different than it does today. *See, e.g.*, Memorandum in Support of Motion for Partial Summary Judgment, R. Doc. 53-1, at 10 (relying on a case decided 96 years before the *Chandris* test was created and 122 years before the *Sanchez* factors were established). Instead, applying the modern tests of the Supreme Court and the Fifth Circuit, it is clear that Dardar is not a Jones Act seaman.

II.    **Dardar qualifies as a "nonseafarer" entitled to recovery of non-pecuniary damages under the *Yamaha* exception.**

Weeks Marine contends that, regardless of seaman status, Claimants are precluded from recovering certain non-pecuniary damages because Dardar qualified as a "seafarer" as recognized in *Yamaha Motor Corporation, U.S.A. v. Calhoun*, 516 U.S. 199 (1996). In *Yamaha*, the Supreme Court authorized the application of state remedies in cases involving the wrongful death of a "nonseafarer" in state territorial waters as a supplement to general maritime law. *Id.* In a footnote, Justice Ginsburg explained that "[b]y 'nonseafarers,' we mean persons who are neither seamen covered by the Jones Act, nor longshore workers covered by the Longshore and Harbor Workers' Compensation Act." *Id.* at 205, n.2. However, in the body of the opinion, she introduced the issue as whether state remedies apply in "maritime wrongful-death cases in which no federal statute specifies the appropriate relief and the decedent was not a seaman, longshore worker, ***or person otherwise engaged in a maritime trade***." *Id.* at 621-22 (emphasis added).

As Weeks Marine notes in its Motion, the Eastern District of Louisiana is split on whether the *Yamaha* exception only includes seamen and longshore workers covered by federal statutory schemes, or also other persons engaged in a maritime trade. In *Savoie v. Chevron Texaco*, Judge Fallon applied Justice Ginsburg's language from the body of the *Yamaha* opinion and held that a commercial fisherman that was neither a Jones Act seaman nor a longshore worker covered by the LHWCA was a seafarer and thus precluded from recovering non-pecuniary damages. *Savoie*, No. 04-1302, 2005 WL 2036740 (E.D. La. July 22, 2005). However, more recently, in *In re Marquette Transportation Company Gulf-Inland, LLC*, Judge Vance ruled to the contrary and applied Judge Ginsburg's language from the *Yamaha* footnote in finding that a deceased, self-employed fisherman could supplement general maritime remedies as a nonseafarer. *In re Marquette Transp. Co. Gulf-Inland, LLC*, 182 F. Supp. 3d 607 (E.D. La. 2016).

11

Importantly, even under Judge Fallon's conception of the *Yamaha* exception, which is more favorable to Weeks Marine's argument, Dardar qualifies as a nonseafarer entitled to recover non-pecuniary damages under state remedies. Weeks Marine and Judge Fallon both favorably reference and strongly rely on the decision in *In re Complaint of Goose Creek Trawlers*, wherein the Eastern District of North Carolina precluded recovery of non-pecuniary damages for the death of a self-employed commercial shrimper in state waters because "by the very nature of his livelihood, [the commercial shrimper] was a 'person otherwise engaged in a maritime trade.'" 982 F. Supp. 946, 950 (E.D. N.C. 1997). In contrast, Dardar's infrequent outings on the MAW MAW EU did not support his livelihood. Dardar was retired and had been living off Social Security benefits prior to his death.[19] Thus, by the very nature of Dardar's livelihood, he was a retiree who enjoyed spending time fishing with his friends.

Nonetheless, Claimants respectfully maintain that Judge Vance correctly held that *Yamaha* does not preclude "persons otherwise engaged in a maritime trade" beyond Jones Act seamen and longshore workers covered by the LHWCA from recovering non-pecuniary damages provided under state law. In *Yamaha*, the Supreme Court noted that "[w]hen Congress has prescribed a comprehensive tort recovery regime to be uniformly applied, there is, we have generally recognized, no cause for enlargement of the damages statutorily provided." 516 U.S. at 215. In other words, based on the uniformity principle, there is no cause to supplement the remedies provided by statutes such as the Jones Act and the LHWCA with state law. Judge Vance's interpretation accords with this reasoning. Furthermore, the Supreme Court explained that "[f]ederal maritime law has long accommodated the States' interest in regulating maritime affairs within their territorial waters." *Id.* at 215 n.13 (citing *Just v. Chambers*, 312 U.S. 383, 390 (1941)

---

[19] *See* Exhibit 2, Declaration of Jonathan Dardar.

(permitting the application of state law for a wrongful death in state waters and noting that "the maritime law [is] not a complete and perfect system"). Also citing *Just v. Chambers*, the Louisiana Supreme Court has noted that "in many maritime tort cases, the interest in uniformity is minimal 'due to the fortuitous nature of accidental injuries and the strong state interest in providing redress for interest.'" *Giorgio v. All. Op. Corp.*, 2005-0002, p. 19 (La. 1/19/06), 921 So. 2d 58, 72 (quoting *Rodrigue v. LeGros*, 563 So. 2d 248, 254 (La. 1990). There, the Court explained that:

> Louisiana has a strong interest in applying its own law in this case: Plaintiffs are Louisiana residents, defendant the State of Louisiana, and the vessel was registered in Louisiana, owned by a Louisiana L.L.C., and moored in Louisiana. The journey began in Louisiana waters and ended in Louisiana waters.

*Giorgio*, 921 So. 2d at 72-73; *see also Trinh ex rel. Tran v. Dufrene Boats, Inc.* 2008-0824 (La. App. 1 Cir. 1/22/09), 6 So. 3d 830, 844 ("Louisiana has a strong interest in applying its laws in a case involving the death of a Louisiana crab fisherman in Louisiana navigable waters."). Weeks Marine hyperbolizes in asserting that "maritime commerce's interests are at its zenith" for a collision resulting in the death of a retired fisherman aboard the vessel of his self-employed friend. In contrast, the same factors that gave rise to a strong state interest in applying Louisiana law in the foregoing cases are also present in this case.

Therefore, general maritime law and the uniformity principle support Judge Vance's interpretation that "seafarers" only includes those seamen and longshore workers otherwise covered by a federal statutory scheme of recovery. It is undisputed that neither federal statute specifies the appropriate relief for Dardar, and thus he is not a seafarer. For the foregoing reasons, regardless of whether this Court applies Judge Fallon or Judge Vance's interpretation of the *Yamaha* exception, Claimants are entitled to supplement general maritime law with state wrongful death and survival laws.

13

**III.    The Dardar Claimants are entitled to pursue punitive damages.**

As explained above, Dardar is **_not_** a seaman, **_nor_** is he a seafarer. "Non seamen should be allowed to pursue non-pecuniary damages, including punitive damages and damages for loss of consortium, under general maritime law." *In re Plaquemine Towing Corp.*, 190 F. Supp. 2d 889, 893 (M.D. La. 2002) (quotations omitted). "Under general maritime law, punitive damages may be available if the plaintiff proves that the defendant's behavior was so egregious as to constitute gross negligence, reckless or callous disregard for the rights of others, or actual malice or criminal indifference." *Cox Operating, LLC v. ATINA M/V*, No. 20-2845 c/w 20-2871, 2023 WL 4685361, at *4 (E.D. La. July 21, 2023). Weeks Marine's behavior in this case was egregious, constituting gross negligence and callous disregard for the rights and safety of others. Indeed, Weeks Marine ignored important policies put in place to ensure the safety of individuals at sea, such as (1) the degree of fog on and around the waterways of Venice, Louisiana, (2) the use of personal cell phones while operating a vessel, (3) the need for a deckhand or lookout during vessel operations, and (4) the status of the navigational equipment on the NOEL R.

To be sure, on the date of the incident, Captain Reynolds sent text messages to Jonathan Crockett's personal cell phone explaining "patchy fog but doable here. I'll give you an update," and Mr. Crockett replied, "safest way possible."[20] Captain Reynolds later confirmed that this text message was in relation to the "new" fog policy because he is "supposed to check in with the project manager during fog season to let him know my intentions about the booster run."[21] Captain Reynolds was also on his cell phone with another boat captain at the time of the incident, and during the call—just seconds before the incident—Captain Reynolds advised the other captain not

---

[20] *See* Exhibit 3, Crockett Text Messages, at 3.
[21] *See* Exhibit 4, Deposition of Cpt. Reynolds, at 82:5-19; *see also id.* at 101:16 -102:12. Captain Reynolds also testified that, although he has a Weeks Marine-provided flip phone, he "hated using it" and "didn't use it," opting for his personal cell phone instead. (*See id.*, at 81:24-85:2).

14

to leave the dock due to the fog.[22]  Notably, Weeks Marine's cell phone policy specifically states that "[a] personal cell phone (with or without a hands-free set) is an unnecessary and unsafe distraction."[23]  This policy was put into place "[t]o eliminate distractions and risks," and further provides that crewmembers "are not to answer or place calls from the [cell phone] while operating any equipment."[24]  But Captain Reynolds, who was controlling the NOEL R, admitted to texting and being on a call while operating the vessel—all after he reported unsafe conditions due to fog. Notwithstanding Weeks Marine's arguments at trial as to the application of the policy to Captain Reynolds, these actions while underway and in the fog violated the policy and constitute a blatant disregard for the safety of other individuals on the waterways.

Additionally, as to the unsafe fog conditions, Weeks Marine's policy regarding "Operations in Fog" provides in pertinent part that "vessels shall be equipped with operable radars" and if "radar . . . [is] not working, the vessel will not leave the dock."[25]  With respect to this requirement for navigational equipment, a passenger of the NOEL R, Travus Strong, indicated that just prior to the incident, Captain Reynolds made a remark about having problems with his radar.[26] Moreover, the policy also explains that vessels are to "[e]nsure a lookout is posted to watch for traffic."[27]  But Broderick Phillips, the deckhand or look-out who was assigned to the NOEL R at the time of the incident, had been away due to personal matters.[28] Weeks Marine knew about Mr. Phillips' absence and potential issues with having a deckhand or lookout.[29]  To not have properly working navigation equipment and the possibility of having no deckhand or lookout in unsafe fog

---

[22] *See* Motion to Quash, R. Doc. 42-1, at 5; Exhibit 4, Deposition of Cpt. Reynolds, at 142:11-23.

[23] Exhibit 5, Cell Phone Policy.

[24] Exhibit 5, Cell Phone Policy.

[25] Exhibit 6, Operations in Fog Policy; *see also* Exhibit 7, Operations in Restricted Visibility – Fog Policy.

[26] *See* Exhibit 8, Deposition of Travus Strong, at 29:25-30:25.

[27] Exhibit 6, Operations in Fog Policy; *see also* Exhibit 7, Operations in Restricted Visibility – Fog Policy.

[28] *See* Exhibit 4, Deposition of Capt. Reynolds, at 160:22-161:17.

[29] *See* Exhibit 4, Deposition of Capt. Reynolds, at 160:22-164:4; *see also* Exhibit 9, Email Correspondence regarding Broderick Philips – Venice Deckhand, dated March 20, 2023.

conditions, coupled with the cell phone usage of the operator of the vessel, is the precise type of egregious, callous disregard for others the policies were meant to protect against.  And as a result of such conduct, an individual was killed.  Based on the above, whether Weeks Marine's conduct rose to such an egregious level to warrant punitive damages is a question for the trier of fact and the punitive damage claims should not be dismissed.

## <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, Claimants respectfully request that the Court deny Weeks Marine's Motion for Partial Summary Judgment. Claimants further ask for any and all relief the Court deems just.

Respectfully submitted,

**FISHMAN HAYGOOD, LLP**

*/s/ Daniel J. Dysart*
**DANIEL J. DYSART (#33812)**
**MONICA L. BERGERON (#39124)**
201 St. Charles Avenue, Suite 4600
New Orleans, LA 70170
Telephone:    504.556.5547
Facsimile:    504.949.8200
Email:  ddysart@fishmanhaygood.com
Email:  mbergeron@fishmanhaygood.com

-and-

16

**LAW OFFICE OF RICHARD V. KOHNKE & ASSOCIATES**

*/s/ Edward F. Kohnke, IV*

**EDWARD F. KOHNKE, IV (#7824) (T.A.)**
**RICHARD V. KOHNKE, SR. (#1166)**
Law Offices of Richard V. Kohnke & Associates
2917 Magazine Street, Suite 201
New Orleans, LA 70115
Telephone:    504.899.6864
Facsimile:    504.899.6858
Email:  rickkohnke@kohnke-law.com
Email:  edwardkohnke@gmail.com

*Counsel for Claimants, Jonathan Dardar and Brandy Mareno, individually and on behalf of their deceased father, Michael Dardar.*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served upon counsel for all parties through the CM/ECF filing system with the Clerk of Court of the United States Court for the Eastern District of Louisiana, on this 9th day of April, 2024.

*/s/ Daniel J. Dysart*
**DANIEL J. DYSART**

17